UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEE MEMORIAL HEALTH SYSTEM f/b/o<br>LEE MEMORIAL HOSPITAL<br>2776 Cleveland Avenue<br>Fort Myers, FL  33901<br><br>           Plaintiff,<br><br>     v.<br><br><br>ALEX AZAR, Secretary,<br>U.S. DEPARTMENT OF HEALTH and<br>HUMAN SERVICES<br>200 Independence Avenue, SW<br>Washington, DC  20201<br><br><br>           Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. _____ |

# COMPLAINT

## I. SUMMARY

1. Plaintiff Lee Memorial Hospital is a public not-for-profit hospital (the "Hospital") owned and operated by Lee Memorial Health System (d/b/a Lee Health). The Hospital treats patients who are eligible to receive benefits from Medicaid, the medical assistance program established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*. (the "Medicaid Act"). The Hospital seeks judicial review of and declaratory and injunctive relief from a change in methodology adopted by Defendant Secretary of the United States Department of Health and

Human Services ("HHS") that unlawfully reduces Medicaid reimbursement for a "disproportionate share hospital" ("DSH") treating a large number of low income patients.

2.  Congress established the DSH program under the Medicaid Act to help relieve the financial burden on hospitals that treat a disproportionate share of Medicaid and uninsured patients. 42 U.S.C. § 1396r-4. The DSH program helps reimburse qualifying hospitals for treating Medicaid and uninsured patients. 42 U.S.C. § 1396r-4(g)(1)(A). The Hospital qualifies to receive payments under the DSH program.

3.  The Medicaid Act requires state Medicaid programs to establish hospital payment rates in a manner that take into account the financial burden shouldered by a DSH in treating low income patients. *See* 42 U.S.C. § 1396a(a)(13)(A)(iv). Thus, DSH payments may not exceed a hospital-specific limit, calculated as the sum of (1) the costs of providing services to individuals eligible for Medicaid, net of payments under the Medicaid Act (often referred to as the "Medicaid shortfall"); plus (2) the costs of providing services to individuals who have no health insurance or other third-party coverage, net of payments by those uninsured patients. 42 U.S.C. § 1396r-4(g)(1)(A). Only the first part of this statutory equation, the methodology for calculating the Medicaid shortfall, is at issue in this case.

4.  The Medicaid Act plainly states that only payments under the Medicaid Act shall be subtracted from costs in calculating a DSH hospital's Medicaid shortfall. 42 U.S.C. § 1396r-4(g)(1)(A). The plain text of the statute does not include payments from Medicare or private insurers as Medicaid payments. *Id.*

5.  HHS's then-contemporaneous interpretation of the hospital-specific limit similarly specified that only Medicaid payments are to be considered in the Medicaid shortfall calculation. *See* a letter to State Medicaid Directors letter, August 17, 1994 (*available at*

https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/smd081794.pdf) (last visited March 12, 2018).

6. In 2008, HHS continued its prior directions to state Medicaid programs when it issued a final rule implementing Medicaid DSH payment reporting and auditing requirements. 73 Fed. Reg. 77904, 77,906 (Dec. 19, 2008); 42 C.F.R. § 447.299(c) (2009).

7. However, since 2010, HHS has adopted a new substantively and procedurally invalid methodology that further reduces the hospital-specific limit.  Contrary to the plain language of the Medicaid Act and contrary to HHS's original, contemporaneous interpretation of the statute, HHS's new methodology directs that certain Medicare payments and private insurance payments be subtracted from a hospital's Medicaid shortfall.  In other words, to calculate the hospital-specific DSH payment limit, HHS's new methodology no longer limits the payments to be deducted to Medicaid payments.  HHS first introduced this invalid methodology, in 2010, in the form of a sub-regulatory document that proposed answers to frequently asked questions (the "FAQs") (*available at* https://www.medicaid.gov/medicaid/finance/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf) (last visited March 12, 2018).

8. In 2017, HHS belatedly published a final rule and amended the 2008 Medicaid DSH regulations to incorporate its new methodology, first introduced by the 2010 FAQs.  82 Fed. Reg., 16,114, 16,122 (Apr. 3, 2017).  HHS directed that the new methodology be applied retroactively.

9. This Court and several others have already preliminarily or permanently enjoined HHS from enforcing its new methodology that lowered the hospital-specific DSH payment limit. *See Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014); *New Hampshire Hosp.*

*Ass'n v. Burwell*, No. 15-cv-460, 2017 U.S. Dist. LEXIS 29549 (D.N.H. Mar. 2, 2017); *Children's Hospital of the King's Daughters, Inc. v. Price*, No. 17-cv-139, 2017 U.S. Dist. LEXIS 96903 (E.D. Va. June 20, 2017); *Tennessee Hosp. Ass'n v. Price*, No. 16-cv-3263, 2017 U.S. Dist. LEXIS 96601 (M.D. Tenn. June 21, 2017); *Children's Health Care v. Price*, No. 16-cv-4064 (D. Minn. June 26, 2017).

10. However, HHS nevertheless continues to apply the new methodology retroactively to cut DSH payments to the hospitals, causing significant and irreparable financial harm.

11. The Hospital respectfully seeks the entry of an order: (1) declaring that HHS's change in methodology to reduce the hospital-specific DSH limit by subtracting certain Medicare payments and private insurance payments from a hospital's Medicaid shortfall is invalid as written and as implemented, violates the governing provisions of the Medicaid Act and prior regulations adopted in 2008, is arbitrary and capricious, and was adopted without observance to the procedure required by law; and (2) granting injunctive relief enjoining HHS from applying the agency's new methodology against the Hospital.

## II.  PARTIES

12. The Hospital is a public non-profit organization under the ownership and control of Lee Memorial Health System (d/b/a Lee Health). The Hospital is located in Fort Myers, Florida.

13. The Hospital treats a disproportionate number of low-income patients and is entitled to receive Medicaid DSH payments.

14. Defendant, Alex Azar, is the Secretary of HHS (the "Secretary") and is sued in his official capacity.

## III.  JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action and the parties under 28 U.S.C. § 1331.

16. Venue is proper in this Court under 28 U.S.C. § 1391(e).

## IV.  STATUTORY AND REGULATORY BACKGROUND

### A. The Medicaid Act

17. The Medicaid Act, enacted in 1965, established "a cooperative federal-state program that provides medical care to needy individuals." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1208 (2012); *see also* 42 U.S.C. § 1396 *et seq.*

18. States are not required to participate in Medicaid but must rigidly comply with federally imposed requirements if they opt to do so. To participate in Medicaid, each state submits a state Medicaid plan, which the Secretary then must review and approve. *See* 42 U.S.C. §§ 1396, 1396a; *see also Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990).

19. Upon approval of the state plan, a state becomes eligible to receive federal matching funds, or "federal financial participation," for expenditures under the approved

Medicaid state plan in providing medical assistance, including payments to hospitals for covered services furnished to Medicaid patients. *See* 42 U.S.C. §§ 1396a, 1396b. The state then transmits reimbursement funds to providers of such services, including the Hospital.

### B. The Medicaid DSH Program

20. In 1981, Congress established the DSH program under the Medicaid Act and required states to set hospital reimbursement rates in a manner that "take[s] into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(a)(13)(A)(iv). Congress intended that "payment adjustment[s]" (meaning supplemental payments) under the DSH program would help relieve the financial burden on hospitals that treat a disproportionate share of Medicaid and uninsured patients. 42 U.S.C. § 1396r-4. This payment adjustment is the Medicaid DSH payment.

21. In 1993, Congress established a limit on the amount of federal financial participation that may be provided to a state Medicaid program to match expenditures for Medicaid DSH payments made to a hospital for a given year. Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13621, 107 Stat. 312, 629-32 (1993) (codified at 42 U.S.C. § 1396r-4(g)(1)(A)).

22. Section 1396r-4(g)(1)(A) sets the limit for a hospital's maximum DSH payment, which may not exceed the hospital's uncompensated care costs:

> [T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A). This payment cap is known as the hospital-specific DSH payment limit.

23. The statute specifies that two categories of uncompensated care costs make up the hospital-specific DSH payment limit and are eligible for DSH payments. The first, often referred to as the "Medicaid shortfall," is statutorily defined as a hospital's costs of services furnished to Medicaid patients, less Medicaid payments other than DSH payments. 42 U.S.C. § 1396r-4(g)(1)(A). Section 1396r-4(g)(1)(A) does not reference private insurance payments or Medicare payments, thus such payments from sources other than Medicaid are not among the statutorily enumerated payments to be counted in the calculation of the Medicaid shortfall. *Id.*

24. The second category includes the cost of services to uninsured patients.

25. Only the calculation of the first category, the Medicaid shortfall, is at issue.

26. In 2003, Congress added Section 13964-4(j) to add annual reporting and auditing requirements to require states to report additional information about their Medicaid DSH programs. *Medicaid Program: Disproportionate Share Hospital Payments*, 73 Fed. Reg. 77,904, 77,904 (Dec. 19, 2008). The purpose of the new requirements is to ensure that each DSH's hospital-specific payment limit has been calculated correctly. This annual report must include:

> A. An identification of each disproportionate share hospital that received a payment adjustment under this section for the preceding fiscal year and the amount of the payment adjustment made to such hospital for the preceding fiscal year.
>
> B. Such other information as the Secretary determines necessary to ensure the appropriateness of the payment adjustments made under this section for the preceding fiscal year.

*Id*.

**C. HHS's Interpretation of The Hospital-Specific Medicaid DSH Payment Limit**

    a. <u>1994 Letter to State Medicaid Directors</u>

27. HHS's original and contemporaneous interpretation did not lower Medicaid hospital-specific DSH payment limits by netting out Medicare payments and private insurance payments.

28. On August 17, 1994, shortly after Congress enacting section 1396r-4(g)(1)(A) establishing the limit on Medicaid DSH payment, HHS issued a letter to state Medicaid directors. (*Available at* https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/smd081794.pdf) (last visited March 12, 2018). The letter interpreted the two categories of uncompensated costs under section 1396r-4(g)(1)(A) as follows:

> CALCULATION OF LIMIT
>
> The limit applicable to DSH payment adjustments is composed of two parts. The first part of the limit is the Medicaid "shortfall". The "shortfall" is the cost of services furnished to Medicaid patients, less the amount paid under the non-DSH payment method under the State plan.
>
> The second part of the formula is the cost of services provided to patients who have no health insurance or source of third party payment for services provided during the year, less the amount of payments made by these patients.

*Id.*

29. The 1994 letter further explained the costs that are included in calculation of the hospital-specific DSH payment limit as follows:

> DSH LIMIT = M + U
>
> M = Cost of Services to Medicaid patient, less the amount paid by the State under the non-DSH payment provisions of the State plan.
>
> U = Cost of Services to Uninsured Patients, less any cash payments made by them.

30. Accordingly, the 1994 letter reflected HHS's original and contemporaneous interpretation of the statute, which complied with section 1396r-4(g)(1)(A) and did not require a hospital to subtract Medicare payments and private insurance payments from the hospital's Medicaid shortfall.

      b. <u>HHS's 2008 DSH Payment Regulation</u>

31. On December 19, 2008, effective January 19, 2009, HHS finalized a final rule implementing Medicaid DSH payment reporting and auditing requirements under legislation enacted in 2003. 73 Fed. Reg. at 77,950. The 2008 regulation adopted the same methodology for calculating the Medicaid hospital-specific DSH payment limit as HHS's original interpretation of section 1396r-4(g)(1)(A) in the 1994 letter. 73 Fed. Reg. at 77,950.

32. Specifically, HHS defined "Total Medicaid Uncompensated Care" as follows:

> *Total Medicaid Uncompensated Care*. The total amount of uncompensated care attributable to Medicaid inpatient and outpatient services. The amount should be the result of subtracting the amount identified in § 447.299(c)(9) from the amount identified in § 447.299(c)(10). The uncompensated care costs of providing Medicaid physician services cannot be included in this amount.

42 C.F.R. § 447.299(c)(11) (2009).

33. The amount identified in section 447.229(c)(9) is the "Total Medicaid IP/OP Payments," defined as the sum of three Medicaid payments as specified in sections 447.299(c)(6), (7) and (8). These three payments are exclusively Medicaid payments that do not include payments made to hospitals by Medicare or private insurers. 42 C.F.R. § 447.229(c)(6)-(9).

34. The amount identified in section 447.229(c)(1) is the "Total Cost of Care for Medicaid IP/OP Services," defined as "[t]he total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals."

42 C.F.R. § 447.229(c)(10).  Again, this definition does not factor in payments made to hospitals by Medicare or private insurers.  *Id.*

35. Further, the 2008 regulation also required states to report information on a hospital's "total annual uncompensated care costs," defined in the regulation as

> The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments.

42 C.F.R. § 477.299(c)(16) (2009).

36. Thus, HHS's 2008 regulation continued the agency's original and contemporaneous interpretation of the hospital-specific DSH payment limit under section 1396r-4(g)(1)(A), which did not direct lowering the payment limit by deducting payments made to hospitals by Medicare or private insurers.

37. HHS further developed guidance to help states understand how the hospital-specific DSH payment limit should be calculated.  *See* General DSH Audit and Reporting Protocol, CMS-2198-F.[1]  This protocol provided the following specific guidance with respect to calculating the Medicaid shortfall:

> To determine the existence of the Medicaid shortfall, Medicaid IP/OP hospital costs (including Medicaid managed care costs) must be measured against Medicaid IP/OP revenue received for such services in the audited State Plan rate year (including regular Medicaid rate payments, add-ons, supplemental and enhanced payments and Medicaid managed care revenues).

*Id.* at 3.

---

[1] This protocol was previously available at http://www.medicaid.gov/medicaid-chip-program-information/by-topics/financing-and-reimbursement/downloads/general_dsh_audit_reporting_protocol.pdf.  However, it is no longer available at the Medicaid website.

38. HHS's protocol did not direct that hospital-specific DSH payment limits be calculated by first subtracting payments from Medicare or private insurance.

   c. <u>In 2010, HHS Changed Its Medicaid DSH Payment Policy Without Notice and Comment And Through Answers to FAQs</u>

39. In January 2010, HHS posted a document on its website entitled "Additional Information on the DSH Reporting and Audit Requirements," which contained Frequently Asked Questions ("FAQs") and HHS's responses purporting to provide additional guidance on, among other things, the calculation of hospital-specific DSH payment limits. With FAQs 33 and 34, HHS abandoned its longstanding methodology and introduced a new requirement that hospitals offset private health insurance payments and Medicare payments for services furnished to Medicaid eligible patients when calculating Medicaid shortfall portion of the hospital-specific DSH payment limit:

> 33. [Q] Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of the MIUR percentage and the DSH limit in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?
>
> [A] Days, cost, and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid inpatient utilization rate (MIUR) for the purposes of determining a hospital eligible to receive DSH payments. Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit. As Medicaid should be the payer of last resort, hospitals should also offset both Medicaid and third party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.
>
> [Q] The regulation states that costs for dual eligibles should be included in uncompensated care costs. Could you please explain further? Under what circumstances should we include Medicare payments?

[A] Section 1923(g) of the Act defines hospital-specific limits on FFP for Medicaid DSH payments. Under the hospital-specific limits, a hospital's DSH payment must not exceed the costs incurred by that hospital in furnishing services during the year to Medicaid and uninsured patients less payments received for those patients. There is no exclusion in section 1923(g)(1) for costs for, and payment made, on behalf of individuals dually eligible for Medicare and Medicaid. Hospitals that include dually-eligible days to determine DSH qualification must also include the costs attributable to dual eligibles when calculating the uncompensated costs of serving Medicaid eligible individuals. Hospitals must also take into account payment made on behalf of the individual, including all Medicare and Medicaid payments made on behalf of dual eligibles. In calculating the Medicare payment for service, the hospital would have to include the Medicare DSH adjustment and any other Medicare payments (including, but not limited to Medicare IME and GME) with respect to that service. This would include payments for Medicare allowable bad debt attributable to dual eligibles.

40. By requiring deduction of private insurance and Medicare payments from Medicaid costs in the calculation of the hospital-specific DSH payment limit, FAQs 34 and 34 directly conflict with the Medicaid Act, the 2008 regulation, and HHS's interpretation for the prior 14 years.

41. Further, FAQs 33 and 34 comprise substantive, legislative rules, amending HHS's existing regulation.  However, HHS published them without opportunity for notice and comment.  HHS also failed to acknowledge or explain its change in methodology in interpreting section 1396r-4(g)(1)(A).

42. Because of the procedural failures, numerous federal courts have preliminarily or permanently enjoined the agency from enforcing the change in methodology introduced by FAQs 33 and/or 34. *See Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 229 (D.D.C. 2014); *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-cv-460, 2017 U.S. Dist. LEXIS 29549, at *43-44 (D.N.H. Mar. 2, 2017); *Children's Hospital of the King's Daughters, Inc. v. Price*, No. 17-cv-139, 2017 U.S. Dist. LEXIS 96903, at*41-43 (E.D. Va. June 20, 2017); *Tennessee Hosp. Ass'n v. Price*, No. 16-cv-3263, 2017 U.S. Dist. LEXIS 96601, at *21-22 (M.D. Tenn. June 21,

2017); *Children's Health Care v. Price*, No. 16-cv-4064, 2017 U.S. Dist. LEXIS 173544, at *29 (D. Minn. June 26, 2017).

43. In addition, several courts have also found substantive deficiencies in the new methodology introduced by FAQs 33 and/or 34. *See Tennessee Hosp. Ass'n*, 2017 U.S. Dist. LEXIS 96601, at *16-20 ("the Court finds that Defendants' policies set forth in the responses to FAQs 33 and 34 violate the APA because they conflict with the unambiguous language of the Medicaid Act."); *Missouri Hosp. Ass'n v. Hargan*, 2018 U.S. Dist. LEXIS 22024, at *24 (Feb. 9, 2018).

44. Despite these adverse judicial findings, HHS has continued to enforce compliance with the new methodology introduced by FAQs 33 and 34, only officially halting their application in Washington and Texas.

    d. The 2017 Amendment

45. As various courts struck down FAQs 33 and 34, HHS issued a proposed rule in August 2016, seeking to amend the calculation of the Medicaid hospital-specific DSH payment limit. *Medicaid Program; Disproportionate Share Hospital Payments – Treatment of Third Party Payers in Calculating Uncompensated Care Costs*, 81 Fed. Reg. 53,980, 53,983 (Aug. 15, 2016).

46. On April 3, 2017, HHS published a final regulation, effective June 2, 2017, adopting the proposed amendment and specifying that "uncompensated care costs include only those costs for Medicaid eligible individuals that remain after accounting for payments made to hospitals by or on behalf of Medicaid eligible individuals, including Medicare and other third party payments that compensate the hospitals for care furnished to such individuals." 82 Fed. Reg. at 16,114-15. This incorporates the methodology introduced by the 2010 FAQs 33 and 34.

47. The 2017 amendment changes the definition of "Total Cost of Care for Medicaid IP/OP Services" under 42 C.F.R. § 447.229(c)(10) to specify that:

For purpose of this section, costs –

(i) Are defined as costs net of third-party payments, including, but not limited to, payments by Medicare and private insurance.

89 Fed. Reg. at 16,122.

48. HHS described the 2017 amendment as a "clarification to existing policy" and an effort to "make[] explicit in the text of the regulation, an existing interpretation." 82 Fed. Reg. at 16,114, 16,118. HHS did not acknowledge its prior interpretation in the 1994 letter or the 2008 regulation.

49. The effective date of the 2017 amendment was June 2, 2017. 82 Fed. Reg. at 16,115. However, HHS stated that the policy "is currently being enforced, applied and implemented uniformly across all states, except in limited instances where [the agency has] suspended enforcement of the existing policy in light of court orders." 82 Fed. Reg. at 16,119. In other words, though HHS claimed "there is no issue of retroactivity," HHS intends to apply the 2017 amendment prior to its effective date.

50. However, the 2017 amendment is a change from the 2008 regulation, which directly and adversely affects the Hospital's Medicaid DSH payments. Thus, it is a substantive new rule that cannot have retroactive effect.

51. The first two district courts to rule on this issue have held that the 2017 amendment, which codified the new methodology introduced by FAQs 33 and/or 34, is invalid and conflicts with the statute. *See Missouri Hosp. Ass'n v. Hargan*, at *24-34 ("The [2017 amendment] is in excess of [HHS's] statutory authority and the [2017 amendment] is set

aside."); *Children's Hospital Ass'n of Texas v. Azar*, Case No. 17-844 (EGS) (March 6, 2018) (vacating the new rule).

52. HHS has also recently conceded that should courts hold that FAQs 33 and 34 violate the APA, the 2017 amendment will not have retroactive effect. *See e.g. Children's Hosp. of the King's Daughters, Inc.*, No: 2:17-cv-139, 2017 U.S. Dist. LEXIS 96903, at *9 n.2.

**D. The Florida Program**

53. The Agency for Health Care Administration ("AHCA") is the single state agency responsible for Medicaid in Florida. HHS approved the Florida State Plan on October 21, 1994, with an effective date of July 1, 1993. *See* State Plan Under Title XIX of the Social Security Act Medical Assistance Program, State: Florida. *(Available at*

http://ahca.myflorida.com/medicaid/stateplanpdf/section_1.pdf) (last visited March 12, 2018).

54. In addition to the Florida State Plan, Florida also participates in a Medicaid federal waiver program. The Medicaid Act gives HHS authority to approve experimental, pilot or demonstration programs that the agency found to be likely to assist in promoting the objectives of the Medicaid program. 42 U.S.C. § 1315. Florida's demonstration project, titled Managed Medical Assistance Program (Project No. 11-W-00206/4), among other things, established a low-income pool ("LIP") to ensure continuing support for the safety net providers that furnish uncompensated care to the Medicaid, uninsured, and underinsured populations. Centers for Medicare & Medicaid Services Special Terms and Conditions, at II. *(Available at*

https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/fl/fl-medicaid-reform-ca.pdf) (last visited on March 12, 2018). LIP payments to hospitals are considered Medicaid hospital revenue for purpose of determining hospital-specific DSH payment limit. *Id.* at XIII(59)(e).

55. Section 409.911 of the Florida Statute relates to the disproportionate share program and states that "[p]ayments made by [AHCA] to hospitals eligible to participate in [the DSH] program shall be made in accordance with federal rules and regulation." Fla. Stat. § 409.911(8).

56. Myers & Stauffer is the certified public accounting firm that contracted with AHCA to perform the mandated DSH audits.  In a 2014 DSH training material, Myers & Stauffer confirmed that it was following the new methodology introduced by HHS's 2010 FAQs 33 and 34:

> 14. Do dual eligible (Medicare/Medicaid) have to be included in the Medicaid UCC?
>
> Yes.  CMS believes the costs attributable to dual eligible patients should be included in the calculation of the uncompensated care costs, but in calculating the uncompensated care costs, it is necessary to take into account both the Medicare and Medicaid payments made. In calculating the Medicare payment, the hospital should include all Medicare adjustments (DSH, IME, GME, etc.).

*Available at* http://www.mslc.com/uploadedFiles/Florida/Downloads/2014%20DSH%20Update_FL%20DSH.pdf (last visited March 12, 2018).

### V. Factual Background

57. The Hospital is a Medicaid DSH hospital and receives DSH payments from AHCA.

58. HHS's new methodology for calculating the hospital-specific DSH payment limit, introduced by the 2010 FAQs 33 and 34 and set forth in the 2017 amendment, have impacted the calculation of the Hospital's DSH payment limit.

59. Pursuant to the auditing requirements, Myers and Stauffer performed the annual mandated DSH Medicaid provider examination.

60.     On September 21, 2016, Myers and Stauffer issued its DSH payment examination results for the Hospital's state DSH year ending on June 30, 2013.  The report found the Hospital's total uncompensated care calculation, *i.e.*, the hospital-specific DSH payment limit, totaled $2,888,785.  As a result, Myers and Stauffer calculated that the Hospital had received in-state DSH payments of $5,470,521 over its DSH payment limit.

61.     On July 25, 2017, Myers and Stauffer issued its DSH payment examination results for the Hospital's state DSH year ending on June 30, 2014.  The report found the Hospital's total uncompensated care calculation, *i.e.*, the hospital-specific DSH payment cap, totaled $2,129,617.  As a result, Myers and Stauffer calculated that the Hospital had received in-state DSH payments of $8,851,569 over its DSH payment limit.

62.     Each of these alleged overpayments was calculated following HHS's new methodology, as introduced in the 2010 FAQs 33 and 24 and as directed by the 2017 amendment.  Thus, contrary to the statute, Myers and Stauffer deducted private insurance and Medicare payments from the calculation of the hospital-specific DSH payment limits.

### VI.     HHS'S FAQS 33 AND 34 AND THE 2017 AMENDMENT VIOLATE BOTH 42 U.S.C. § 1396R-4(G)(1)(A) AND THE APA

63.     The Court should hold unlawful and set aside HHS's new methodology for calculating the Medicaid shortfall used to establish hospital-specific DSH payment limits, introduced by the 2010 FAQs 33 and 34 and echoed in the 2017 amendment, because the methodology is: (A) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, (B) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and/or (C) adopted and implemented without observance of procedure required by law, insofar as:

a. HHS's change in methodology, set forth in the 2010 FAQs 33 and 34 and the 2017 amendment, is contrary to the unambiguous dictates of 42 U.S.C. § 1396r-4(g)(1)(A). Section 13964-4(g)(1)(A) defines the specific categories of payments (*viz.*, only Medicaid payments) that should be counted in calculating the Medicaid shortfall category of hospital-specific Medicaid DSH payment limits.  The statute does not include payments from Medicare or private insurers as those to be offset against the cost of services furnished to Medicaid patients.  *Id.*

b. HHS's changed methodology conflicts with the purpose of section 13964-4(g)(1)(A) to help relieve the financial burden on hospitals resulting from treating a disproportionate share of Medicaid and uninsured patients.  Instead, the change in methodology causes significant and irreparable financial harm to the Hospital.

c. HHS's changed methodology is not a reasonable interpretation of section 13964-4(g)(1)(A) in that, by way of example and not limitation, it conflicts and is incompatible with HHS's original and contemporaneous interpretation, as reflected in the 1994 letter and the 2008 regulations.

d. HHS's changed methodology is arbitrary, capricious, not entitled to deference, and violates the APA because HHS has failed to acknowledge the change in law and policy, let alone offer good reasons to support such a change.

e. HHS's 2010 FAQs 33 and 34 and the new methodology introduced therein are arbitrary, capricious, an abuse of discretion, and not in accordance with the law because they violated the existing 2008 regulation.  It is arbitrary and capricious for an agency to adopt an interpretation of a regulation that is "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. c. Shalala*, 512 U.S.

501, 512 (1994).  Thus, HHS could not even apply its new methodology prior to the effective date of the 2017 amendment.

f.  HHS's 2010 FAQs 33 and 34 and the new methodology introduced therein violate the APA's notice and comment rulemaking requirements.  5 U.S.C. § 553.  The new methodology is a legislative rule because it substantively altered the existing law under the 2008 regulation.  Thus, the APA requires HHS to conduct notice and comment rulemaking in adopting such a change.  HHS's failure to do so renders FAQs 33 and 34 invalid.

g.  HHS's 2017 amendment also violates the APA's notice and comment rulemaking requirement because HHS failed to respond to relevant comments and did not consider significant aspects of the problems.  5 U.S.C. § 553.

h.  HHS's 2017 amendment cannot be applied retroactively because it is a substantive change to the existing 2008 regulation.  Thus, retroactive application is not permissible without express Congressional authorization, which Congress has not granted here.  In the event the Court determines that the 2017 amendment is valid, it can only have prospective application.

## VII. REQUEST FOR RELIEF

WHEREFORE, the Hospital respectfully requests that the Court enter an order:

1. Invalidating and vacating the methodology directed by the 2010 FAQs 33 and 34 and the 2017 amendment;

2. Preliminarily and/or permanently enjoining HHS from enforcing, applying, or implementing the 2010 FAQs 33 and 34;

3. Preliminarily enjoining HHS from enforcing, applying or implementing the 2017 amendment pending a decision on the merits;

4. Ordering HHS to notify Florida's AHCA that, pending further order by the Court, the enforcement of the FAQs 33 and 24 and the 2017 amendment is enjoined and HHS shall take no action to recoup any federal DSH funds based on the FAQs 33 and 24 and/or the 2017 amendment;

5. Awarding the Hospital its attorney fees and costs for prosecution of this appeal as permitted under any applicable law; and

6. Granting the Hospital such further and additional relief as may be just and warranted.

Respectfully submitted this 20th day of March, 2018.

By: /s/ Stephen P. Nash
Stephen P. Nash
(D.C. Bar #PA0037)
SQUIRE PATTON BOGGS (US) LLP
1801 California St, Suite 4900
Denver, CO 80202
Tel.: (303) 830-1776
Fax: (303) 894-6173
E-mail: stephen.nash@squirepb.com

*Counsel for Plaintiff*

010-8557-9559